In the

# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 22-2349

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

XUAN TAM,

Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 19 CR 158 — Virginia M. Kendall, *Judge*.

# BRIEF AND APPENDIX OF THE UNITED STATES

JOHN R. LAUSCH, JR.
United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

JONATHAN L. SHIH
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................. 1

STATEMENT OF THE CASE ............................................................. 2

SUMMARY OF ARGUMENT .......................................................... 11

ARGUMENT ................................................................................. 12

   I.    The District Court Committed Harmless Error in Neglecting To Confirm That Defendant Had Reviewed and Discussed the PSR. ................................................................................. 12

      A.    Standard of Review ................................................ 12

      B.    Analysis ................................................................ 12

   II.    The District Court Did Not Commit Error in Concluding That Defendant Was Not a Minor Participant in the Criminal Activity. .............................................................................. 17

      A.    Standard of Review ................................................ 17

      B.    Analysis ................................................................ 17

         1.    The Court Did Not Err In Concluding That Defendant Was Not Entitled to a Minor Role Reduction. ................................... 17

         2.    The District Court Sufficiently Explained Its Reasons for Declining To Apply Minor Role Adjustment ............................ 24

   III.    Defendant's Ineffective Assistance of Counsel Claim Is Premature and Lacks Merit. ........................................... 28

      A.    Standard of Review ................................................ 28

B.    Analysis ........................................................... 28

    1.    Defendant's Claim Is Premature, and He Has Waived a Request To Remand for an Evidentiary Hearing..................... 28

    2.    Defendant's Counsel at Sentencing Did Not Render Ineffective Assistance. ............................................ 31

CONCLUSION ............................................................ 40

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................... 38

*Johnson v. United States*, 520 U.S. 461 (1993) ................................................. 28

*Massaro v. United States*, 538 U.S. 500 (2003) ........................................... 29, 30

*Resnick v. United States*, 7 F.4th 611 (7th Cir. 2021) ...................................... 31

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................ 31

*United States v. Brodie*, 507 F.3d 527 (7th Cir. 2007) ...................................... 37

*United States v. Brown*, 785 F.2d 587 (7th Cir. 1986) ...................................... 13

*United States v. Campuzano-Benitez*, 910 F.3d 982 (7th Cir. 2018) ........ *passim*

*United States v. Carbajal*, 717 F. App'x 234 (4th Cir. 2018) ........................... 18

*United States v. Cates*, 950 F.3d 453 (7th Cir. 2020) ....................................... 28

*United States v. Chapman*, 694 F.3d 908 (7th Cir. 2012) ................................. 39

*United States v. Cieslowski*, 410 F.3d 353 (7th Cir. 2005) ............................... 37

*United States v. Diaz*, 884 F.3d 911 (9th Cir. 2018) ............................. 25, 26, 27

*United States v. Flores*, 739 F.3d 337 (7th Cir. 2014) ................... 28, 29, 30, 32

*United States v. Grzegorczyk*, 800 F.3d 402 (7th Cir. 2015) ............................ 17

*United States v. Guzman-Ramirez*, 949 F.3d 1034 (7th Cir. 2020) ........... 18, 19

*United States v. Hancock*, 825 F.3d 340 (7th Cir. 2016) .................................. 37

*United States v. Harper*, 766 F.3d 741 (7th Cir. 2014) .................................... 17

*United States v. Harris*, 394 F.3d 543 (7th Cir. 2005) ................................. 29, 30

*United States v. Jarigese*, 999 F.3d 464 (7th Cir. 2021) .................................. 13

*United States v. Lathrop*, 634 F.3d 931 (7th Cir. 2011) ................................... 37

iii

*United States v. Maez*, 960 F.3d 949 (7th Cir. 2020) ...................................... 28

*United States v. Natour*, 700 F.3d 962 (7th Cir. 2012) ................................... 17

*United States v. Panaigua-Verdugo*, 537 F.3d  (7th Cir. 2008)..................... 24

*United States v. Patel*, 746 F. App'x 569 (7th Cir. 2018) ............................... 23

*United States v. Pulley*, 601 F.3d 660 (7th Cir. 2010).................................... 12

*United States v. Quintero-Leyva*, 823 F.3d 519 (9th Cir. 2016) ............... 26, 27

*United States v. Rezin*, 322 F.3d 443 (7th Cir. 2003).................................... 37

*United States v. Rodriguez*, 44 F.4th 1229 (9th Cir. 2022)....................... 26, 27

*United States v. Rodriguez-Luna*, 937 F.2d 1208 (7th Cir. 1991) ................. 13

*United States v. Rone*, 743 F.2d 1169 (7th Cir. 1984).................................... 13

*United States v. Russell*, 662 F.3d 831 (7th Cir. 2011) ................................. 39

*United States v. Ruzzano*, 247 F.3d 688 (7th Cir. 2001)................................ 28

*United States v. Sanchez*, 989 F.3d 523 (7th Cir. 2021) ............................... 19

*United States v. Sandoval-Velazco*, 736 F.3d 1104 (7th Cir. 2013) ............... 17

*United States v. Starnes*, 14 F.3d 1207 (7th Cir. 1994) ........................... 32, 38

*United States v. Stuart*, 773 F.3d 849 (7th Cir. 2014) ................................... 28

*United States v. Torres-Hernandez*, 843 F.3d 203 (5th Cir. 2016)................. 25

*United States v. Trevino*, 60 F.3d 333 (7th Cir. 1995) ................................... 31

*United States v. Turnipseed*, 47 F.4th 608 (7th Cir. 2022)............................ 18

*United States v. Valcan*, 493 F. App'x 806 (7th Cir. 2012) ....................... 22, 23

*United States v. Wagner*, 996 F.2d 906 (7th Cir. 1993) ................................. 13

*United States v. White*, 737 F.3d 1121 (7th Cir. 2013) ................................... 17

## STATUTES

18 U.S.C. § 1956 .................................................................... 1, 4

18 U.S.C. § 1960(a) ............................................................... 1, 4

18 U.S.C. § 3231 ...................................................................... 1

18 U.S.C. § 3553(a) ........................................................... *passim*

18 U.S.C. § 3742(a) ................................................................. 1

28 U.S.C. § 1291 ..................................................................... 1

28 U.S.C. § 2255 ............................................................... 29, 30

## RULE

Federal Rule of Criminal Procedure 32(i)(1)(A) .................................. 12, 15, 16

## SENTENCING GUIDELINES

U.S.S.G. § 3B1.2 .............................................................. *passim*

U.S.S.G. § 3B1.3 ................................................................. 23

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is not complete and correct. Defendant was charged with conspiracy to commit money laundering, money laundering, and operating an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(B)(i), 1960(a), and 2. R. 37.[1] Defendant pled guilty to conspiracy to commit money laundering and was sentenced by the district court on July 19, 2022. R. 149, 183. The district court's final judgment was entered on the docket on July 20, 2022. R. 184. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

Defendant filed a timely notice of appeal on July 29, 2022. R. 186. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court's failure to expressly confirm that defendant had read the Presentence Investigation Report ("PSR") and discussed it with his attorney was harmless.

---

[1] The Original Electronic Record on Appeal is cited as "R." The sentencing transcript, which is included in the government's appendix, is cited as "G. App." The Presentence Investigation Report and Supplemental Presentence Investigation Report are cited as "PSR" and "Supp. PSR," respectively. Defendant's brief and short appendix are cited as "Br." and "App.," respectively. Citations are followed by applicable document, exhibit, page, or paragraph numbers.

2.     Whether the district court erred at sentencing by denying defendant's request for a minor role adjustment pursuant to U.S.S.G. § 3B1.2, and by failing to make its findings in that regard sufficiently explicit.

3.     Whether the defendant was denied his constitutional right to effective assistance of counsel at sentencing.

## STATEMENT OF THE CASE

### *Offense Conduct*

Between approximately May 2017 and August 2017, defendant laundered approximately $1.4 million of drug proceeds for Mexican drug traffickers. R. 150 at 5; PSR ¶ 12. During that period, on approximately 10 to 20 occasions, defendant received bulk quantities of drug proceeds in U.S. currency from drug traffickers, ranging between $30,000 to $150,000 per transaction. R. 150 at 4; PSR ¶ 10. Defendant and his associates would arrange and execute wire transfers to bank accounts in China in an equivalent amount of Chinese Renminbi ("RMB"). R. 150 at 5; PSR ¶ 8.

In general, when a drug trafficker needed money laundered, defendant was first contacted by another member of his organization. R. 150 at 4; PSR ¶ 11. Defendant would provide his contact with the serial number of a dollar bill in his possession; that serial number served as a code word and identifier for the subsequent transaction. *Id*. The drug trafficker would contact

defendant personally and provide the serial number, and defendant then would arrange to meet the drug trafficker in Chicago. *Id.*

At that meeting, the drug trafficker provided defendant with U.S. currency to be laundered, and defendant provided the drug trafficker with the dollar bill bearing the aforementioned serial number. R. 150 at 4-5; PSR ¶ 11. Subsequently, defendant counted the U.S. currency and reported the amount to an associate, who, in turn, would provide defendant or others with information for Chinese bank accounts that would be used for the "mirror transactions." R. 150 at 3-5; PSR ¶¶ 8, 11. Finally, defendant or an associate would deliver the U.S. currency to a broker, who arranged for the release of an equivalent amount of RMB in China to the aforementioned bank accounts. R. 150 at 5, PSR ¶ 11.

Defendant earned approximately $7,500 for his services, and his compensation was calculated as a percentage fee for each money laundering transaction he helped execute. R. 150 at 5. Additionally, defendant knew that the U.S. currency that he received was derived from the sale of narcotics, and that the purpose of these transactions was to remit funds back to drug traffickers in Mexico. *Id.* at 5-6.

### Charges and Guilty Plea

On October 20, 2020, defendant was charged in Counts 1, 2 and 8 of the superseding indictment. R. 37. Count 1 charged defendant with conspiracy to

commit money laundering, in violation of 18 U.S.C. § 1956(h). *Id.* Count 2 charged defendant with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2, and Count 8 charged him with operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a) and 2. *Id.*

On February 15, 2022, defendant pled guilty to the conspiracy charge pursuant to a plea agreement. R. 149-50. The agreement noted the parties' dispute over whether defendant was a minor participant in the offense and, therefore, whether his offense level should be decreased by two levels pursuant to U.S.S.G. § 3B1.2(b). R. 150 at 8. The agreement noted that the parties were free to "present evidence and argument on this issue at sentencing." *Id.*

### Presentence Investigation Report

Before defendant's sentencing, the United States Probation Office prepared the PSR and a Supplemental PSR. The probation officer calculated defendant's base offense to be 22, pursuant to Guideline § 2S1.1. PSR ¶ 19. The probation officer applied a 10-level enhancement because defendant knew that the laundered funds were the proceeds of drug trafficking; because defendant was convicted under 18 U.S.C. § 1956; and because the offense involved sophisticated laundering. *Id.* at ¶¶ 20-22. The probation officer did not apply a mitigating or aggravating role adjustment, pursuant to Guidelines §§ 3B1.1 or 3B1.2. *Id.* at ¶¶ 24-26. Specifically, the probation officer concluded that

4

defendant was "not substantially less culpable than the average participant; rather, he was the average participant" and noted that defendant "knew that the proceeds he collected and delivered were derived from the sale of narcotics." *Id.* at ¶ 26. Furthermore, the probation officer stated that "the defendant's knowledge of the scope and structure of the criminal activity precludes the assertion that he was a minor participant." *Id.*

After a three-level reduction for acceptance of responsibility, pursuant to Guideline § 3E1.1, defendant's total offense level was 29. Supp. PSR ¶ 15. Defendant's criminal history category was I, resulting in an advisory Guidelines range of 87 to 108 months imprisonment. *Id.* at ¶ 25.

### Parties' Sentencing Submissions

Defendant filed one objection to the PSR. R. 177. Specifically, he contended that he was entitled to a two-level reduction for playing a minor role in the offense, pursuant to Guideline § 3B1.2(b). *Id.* Defendant argued that he was "less culpable than the other participants," in that his participation "was not that of an organizer," and he "did not oversee or create the conspiracy." *Id.* at 1-2. Additionally, defendant contended that he did not "control the electronic money transfers" and therefore "was merely an intermediary who picked up the money and dropped it off." *Id.* Finally, defendant noted that he "benefitted approximately $7,500 from the myriad of transactions outlined in the [PSR]." *Id.* at 2.

5

Defendant also filed a sentencing memorandum requesting a below-Guidelines sentence, citing 18 U.S.C. § 3553(a). R. 177. In addition to arguments regarding defendant's role in the offense, he also noted his lack of criminal history; the fact that he proffered truthful information to law enforcement after his arrest; the burden that a lengthy term of his imprisonment would impose on his family, including his wife, children, and ailing father; and his assertion that he was not likely to recidivate. *Id.* at 2-3.

The government did not file objections to the PSR. The government submitted a sentencing memorandum requesting a below-Guidelines sentence of 65 months' imprisonment. R. 178. In the memorandum, the government argued that defendant was not substantially less culpable than the other participants in the offense, instead describing defendant as the "second most culpable of the couriers." *Id.* at 4. However, considering defendant's lack of criminal history, his "sustained good conduct since engaging in the offense of conviction," and the fact that defendant was "unlikely to reoffend," the government agreed that the appropriate balance of the § 3553(a) factors called for a below-Guidelines sentence. *Id.* at 6-7.

### *Sentencing Hearing*

On July 18, 2022, the district court conducted defendant's sentencing hearing, with defendant physically present along with his counsel. R. 183.

6

At the outset of the hearing, the district court made repeated references to the PSR. It explained the nature of the hearing to defendant, including that the court would "go through the [PSR] . . . to see if there's any factual changes." G. App. 2-3. It noted that among the materials the court had reviewed, it had "in front of me, first, [the probation officer's] report from April 12, 2022," as well as a "supplemental report from June 8th of 2022," and the probation officer's "sentencing recommendation from June 8 of 2022." *Id.* at 3-4. Subsequently, the sentence judge asked defense counsel whether he had any "factual changes to the [PSR]." *Id.* at 4. Counsel responded: "Judge, I do not. I have reviewed both reports with my client, and there are no factual changes." *Id*. In response to the same question from the district court regarding factual changes to the PSR, the government stated, "No changes, your Honor." *Id*. Consequently, the district court explained that it would adopt the PSR "as written." *Id.*

Later in the hearing, the district court heard argument from both parties regarding defendant's role in the offense. Reiterating arguments from defendant's sentencing memorandum, defense counsel argued that although "the whole conspiracy went on for a number of years," defendant only "was involved for seven months"; that defendant's participation "was minor"; and that "[h]e did not organize the conspiracy." G. App. 6; *see also id.* ("He was a player in the conspiracy . . . but he did not organize it"); *id.* ("He was just . . .

one level of the entire conspiracy."). After hearing defendant's arguments, the district court confirmed that counsel was "primarily . . . distinguishing on the length of time . . . and the amount of money he laundered." *Id.* Defense counsel agreed with that characterization of the argument. *Id.*

For its part, the government reiterated arguments from its sentencing memorandum explaining why defendant did not merit a minor-role reduction. G. App. 6-8. More specifically, in response to defendant's argument that his role in the conspiracy was limited to a seven-month stint, the government explained that defendant "was a courier in the organization" and that all of the couriers were "involved for truncated periods of time." *Id.* at 6. The government continued: "They sort of jumped in at different parts of the conspiracy . . . because they were replacing each other." *Id.* at 6-7 (providing examples of couriers who replaced one another). The government also stressed defendant's "continuous, ongoing conduct for seven months"; his involvement in "15 to 20 money pick-ups"; his "central" role in "passing the information needed to conduct the secure transaction," which reflected a "depth of involvement that goes on just beyond physically transporting things"; defendant's understanding of "the scope and structure of the organization"; and defendant's knowledge that "the funds were going through China for purposes of laundering them, and that they were ultimately being remitted to the cartel in Mexico." *Id.* at 7-8. Finally, the government noted that defendant, as well as

8

the co-conspirators, were profiting "at the exact same amount," namely, a percentage-fee of each transaction. *Id.* at 8.

Having heard these arguments and considered the parties' submissions, G. App. 3-4, 9, the district court overruled defendant's objection to the PSR's conclusion that defendant's conduct did not warrant the minor-role reduction, *id.* at 8-9. In reaching its conclusion, the district court explained:

> [W]e look to the degree to which he understood the scope and the structure, and he certainly did . . .
>
> [We look to] the degree to which he participated in the planning. And then, of course, the degree to which he exercised authority or influenced the exercise and decision-making authority, the nature and extent of his participation, and then whether he stood to benefit. . . .
>
> I don't think the reduction is appropriate based on the factual statements that [the government] just made.

*Id.*

Having made this determination and after applying a three-level reduction for acceptance of responsibility, the district court calculated, with the parties' agreement, that the advisory Guidelines range was 87 to 108 months' imprisonment. G. App. 9-10. The court then considered the parties' arguments regarding the § 3553(a) factors. The government requested a below-Guidelines sentence of 65 months' imprisonment, noting that defendant was "unlikely to re-offend" and had no criminal history. *Id.* at 11-13. Defense counsel requested a "significant below-guidelines sentence," explaining that

defendant was interviewed by law enforcement and provided truthful information. *Id*. at 14-15. Additionally, counsel contended that because defendant had not engaged in any additional criminal conduct in the "five years" since the charged offense, "re-offending isn't an issue." *Id*. at 14. Further, mirroring his arguments regarding the minor role adjustment, defense counsel contended that although the conspiracy "went on for five years," defendant "was not involved that long." *Id*. Finally, counsel noted the "burden on [defendant's] family," including his two children, wife, and his parents, that would come with "[a]ny term of incarceration." *Id*. at 15. In his later allocution, defendant expressed contrition and a desire to "start a new life back – back home with my family." *Id*. at 16.

The district court sentenced defendant to a below-Guidelines term of 65 months' imprisonment. G. App. 19. In imposing its sentence, the court characterized the advisory Guidelines range "as a reasonable range of 87 to 108 months" and reiterated that the range "is where we should be looking." *Id*. The court also determined that defendant's offense was "extremely serious," as defendant laundered money for drug cartels. *Id*. at 18. The court described the work of drug cartels as "bloody," and "horrible," flatly stating, "the work of the cartel cannot be aided." *Id*. at 17. Conversely, the district court stated that the "number one factor that weighs in [defendant's] favor is that, once you did

proffer, it's been five years and you haven't gone back to this illegal activity or other illegal activity." *Id.* at 17-18.

## SUMMARY OF ARGUMENT

This Court should affirm defendant's sentence.

First, by neglecting to ask at sentencing whether defendant had read the PSR, discussed it with his attorney, and wished to dispute any of the facts presented therein, the district court committed a harmless error. Defendant has not alleged, in this Court or in the district court, that he did not in fact review the PSR or discuss it with his attorney. That lack of allegation alone is sufficient for this Court to conclude that no reversible error occurred. Moreover, the record in this matter, including statements and arguments made by defense counsel at sentencing, strongly indicates that defendant was familiar with the PSR and its contents and thus underscores the overall fairness of defendant's sentencing process.

Second, the district court did not err when it concluded that defendant was not entitled to a minor role adjustment pursuant to Guideline § 3B1.2. The district court was aware of, and evaluated, the factors identified in the commentary to Guideline § 3B1.2. In light of those factors, the court correctly determined that defendant was not substantially less culpable than the average participant in the criminal activity, where defendant helped plan and execute transactions tying his money laundering organization to drug

traffickers; understood that he was laundering narcotics proceeds; independently handled approximately $1.4 million in such proceeds; and had a proprietary interest in the success of the enterprise.

Finally, defendant's ineffective assistance of counsel claim is both premature and baseless. Defendant has not established that his counsel's performance was either deficient or prejudicial, where he has failed to identify any arguments or information that defense counsel did not bring to the court's attention, of which the district court was otherwise not already aware, and that would reasonably would have led to a different outcome in the proceedings.

## ARGUMENT

### I.     The District Court Committed Harmless Error in Neglecting To Confirm That Defendant Had Reviewed and Discussed the PSR.

#### A.     Standard of Review

"Whether the district court followed proper sentencing procedure is a legal question reviewed *de novo*." *United States v. Pulley*, 601 F.3d 660, 664 (7th Cir. 2010) (internal citation omitted).

#### B.     Analysis

Pursuant to Federal Rule of Criminal Procedure 32(i)(1)(A), "[t]he district court at the sentencing hearing need directly ask the defendant only three questions—whether he or she has had an opportunity to read the [PSR], whether the defendant and defense counsel have discussed the [PSR] and whether the defendant wishes to challenge any facts in the [PSR]." *United*

*States v. Jarigese*, 999 F.3d 464, 472 (7th Cir. 2021) (quoting *United States v. Rone*, 743 F.2d 1169, 1174 (7th Cir. 1984)). District courts are advised "to carry out this brief questioning in the interest of focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence." *Id.* (quoting *United States v. Rodriguez-Luna*, 937 F.2d 1208, 1213 (7th Cir. 1991)). But a remand for resentencing is not required "if the defendant's right to a fair sentencing process was not compromised, *i.e.*, if the error was harmless." *Id.*

Here, the district court did not ask defendant these three questions at his sentencing hearing. The district court's error was nonetheless harmless. In *United States v. Wagner*, this Court held that there was no reversible error "where a defendant did not deny that he had an opportunity to review the [PSR] and disputed issues were addressed by the district court." 996 F.2d 906, 916 (7th Cir. 1993) (citing *United States v. Brown,* 785 F.2d 587 (7th Cir. 1986)). Here, too, both before the district court and on appeal, defendant has never alleged that he did not have an opportunity to review the PSR or to discuss it with his attorney. Nor has defendant raised any disputed sentencing issues left unresolved by the sentencing judge.

Indeed, the record strongly reflects both that defendant had the opportunity to review the PSR with his attorney and that the PSR presented no factual disputes. At defendant's sentencing, the district court detailed the

13

submissions it had reviewed: the original PSR, the supplemental PSR, probation's sentencing recommendation, and the parties' sentencing memoranda. G. App. 3-4. The district court then explicitly asked defense counsel—with defendant physically present at the hearing—whether he had any "factual changes to the report." *Id.* at 4. Defense counsel responded: "Judge, I do not." *Id.* Counsel continued: "*I have reviewed both reports with my client, and there are no factual changes.*" *Id.* (emphasis added). Notably, defendant did not contradict his counsel's statement at the sentencing, and on appeal, he has identified no reason to believe that it was inaccurate.

Other aspects of the record corroborate the conclusion that defendant had the opportunity to review the PSR with his attorney and to identify any disputed issues. At the hearing, while speaking directly to defendant, the district court explained how the sentencing hearing would proceed. G. App. 2-3 ("So, Mr. Tam, this is how we're going to proceed."). The district court began by emphasizing the importance of the PSR. It stated: "First, I'm going to go through the report and what I have in front of me to see if there's any factual changes." *Id.* The court continued by explaining that, before imposing its sentence, it would also "calculate a sentencing guidelines calculation," consider the § 3553(a) factors, and give the parties, and defendant personally, "an opportunity to speak." *Id.* at 3. At the end of this fulsome explanation, the court asked defendant: "Okay?" Although the transcript reflects no affirmative

14

response from defendant, it also contains nothing to suggest that defendant said or did anything to indicate that he did not understand the court's explanation, including its express reference to the PSR and "any factual changes." *Id*. Rather, the next recorded words came from the court: "Alright. So let's get started." *Id*.

At the sentencing, defendant had still more opportunities to register any unfamiliarity with the PSR. For example, in addition to confirming with defense counsel that defendant had no changes to the PSR, the district court posed the same question to the government. G. App. 4 (eliciting a response of "no changes"). And toward the conclusion of the hearing, defendant used his opportunity to allocute to express contrition and his desire to return to his family. At neither juncture, however, did defendant raise any concerns about the PSR, state that he did not review or understand it, or dispute any facts with the potential to affect his sentence. Under these circumstances, the district court's error under Rule 32(i)(1)(A) was harmless.

Defendant contends that, owing to the district court's error, it did not have the opportunity to explore more fully facts regarding defendant's role in the money laundering conspiracy and, hence, whether an offense-level reduction was warranted under Guideline § 3B1.2. Br. 9-10. In particular, defendant now contends that he could have provided the court with additional information regarding his role in the offense, such as "if he was immediately

replaced with another individual after [defendant] voluntarily withdrew from the conspiracy." *Id.* at 10. But as set forth above and below, the parties provided the district court with ample information regarding defendant's role in the offense both in advance of, and at, the hearing. *See supra* at 5, 7-8; *see infra* at 19-24. Defendant thus cannot credibly dispute the court's awareness that he participated in the money laundering conspiracy for only a short period of time. R. 177 at 1 (in his sentencing memorandum, defendant stated that he "played a small part in this larger conspiracy in that he participated only between May and September of 2017"); G. App. 6 (defense counsel told the court that "this offense for the whole conspiracy went on for a number of years" and that defendant "was involved for seven months"). Indeed, the government relayed to the court the precise "new" information defendant has identified on appeal: the fact that defendant was replaced by other couriers. G. App. 6-7 (prosecutor explained that couriers, like defendant, "sort of jumped in at different parts of the conspiracy . . . because they were replacing each other").

In short, where defendant has never contended that he did not review the PSR with his counsel and has not identified any unresolved factual issues—and where the record support neither claim—the district court's failure to adhere to Rule 32(i)(1)(A) constitutes harmless error.

16

## II. The District Court Did Not Commit Error in Concluding That Defendant Was Not a Minor Participant in the Criminal Activity.

### A. Standard of Review

This Court reviews the district court's interpretation of the Guidelines *de novo*. *See United States v. Grzegorczyk*, 800 F.3d 402, 405 (7th Cir. 2015); *United States v. White*, 737 F.3d 1121, 1139 (7th Cir. 2013). It reviews a district court's factual determinations underlying the application of the Guidelines for clear error. *United States v. Harper*, 766 F.3d 741, 744 (7th Cir. 2014). "When reviewing sentencing courts' decisions on mitigating or aggravating roles for clear error," this Court "will rarely reverse, as the sentencing court is in the best position to determine the role that a defendant had in the criminal activity." *See United States v. Campuzano-Benitez*, 910 F.3d 982, 989 (7th Cir. 2018) (citing *United States v. Sandoval-Velazco*, 736 F.3d 1104, 1107 (7th Cir. 2013)).

Finally, this Court reviews procedural errors *de novo*, including a district court's failure to explain adequately its sentencing determinations. *See United States v. Natour*, 700 F.3d 962, 974 (7th Cir. 2012).

### B. Analysis

#### 1. The Court Did Not Err In Concluding That Defendant Was Not Entitled to a Minor Role Reduction.

Guideline § 3B1.2 provides a two-level reduction for a defendant who is a "minor participant in any criminal activity." As explained in the commentary,

17

the reduction is appropriate for "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. 3(A); *see also United States v. Turnipseed*, 47 F.4th 608, 615 (7th Cir. 2022).

"District courts are instructed to consider several factors when assessing the defendant's role in the conspiracy." *United States v. Guzman-Ramirez*, 949 F.3d 1034, 1037 (7th Cir. 2020) (*citing Campuzano-Benitez*, 910 F.3d at 989). These factors are:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. 3(C). This list is "non-exhaustive," *id.*, "and no single factor is dispositive," *see United States v. Carbajal*, 717 F. App'x 234, 241 (4th Cir. 2018). Instead, the Guidelines recognize that application of a minor role reduction is "based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."

U.S.S.G. § 3B1.2 cmt. 3(C); *United States v. Sanchez*, 989 F.3d 523, 545 (7th Cir. 2021) (application of § 3B1.2 is "fact specific, based on the district court's evaluation" of defendant's role "in context of the other participants in the scheme"). Defendant bears the burden to prove that the reduction should apply by the preponderance of the evidence. *Sanchez*, 989 F.3d at 544-45.

Here, the district court did not err when it determined that defendant was not substantially less culpable than the conspiracy's average member and therefore not entitled to a two-level offense-level reduction under Guideline § 3B1.2(b).

With respect to the first factor—"the degree to which the defendant understood the scope and structure of the criminal activity"—defendant's status as a "courier" is not talismanic and does not compel application of the minor role reduction. *See Guzman-Ramirez*, 949 F.3d at 1037 (rejecting argument that couriers "should categorically receive a minor-role adjustment"). Moreover, the undisputed facts here demonstrate that, even in the role of courier, defendant understood the scope and structure of the criminal activity in which he was engaged. In his plea agreement, defendant admitted knowing—based on his "personal experience . . . the large amounts of cash involved, the covert nature and circumstances of these money pickups . . . the arrests of some of his associates involved in the money pickups, and the prompt use of those U.S. dollars to buy RMB in China"—"that the proceeds he

was collecting and delivering were derived from the sale of narcotics." R. 150 at 5-6. Defendant also admitted that he understood that the ultimate purpose of these transactions was to "remit the funds back to drug traffickers in Mexico." *Id*. In other words, consistent with the district court's analysis of Guideline § 3B1.2, the first factor weighs against application of the minor role reduction.

The second and third factors—which concern the extent to which defendant participated in planning or organizing the criminal activity and exercised decision-making authority—also cut against the minor role reduction. As described in both the plea agreement and the PSR, defendant admitted that in connection with each monetary transaction he handled, he selected and provided the serial number for a dollar bill, which served as an identifier and code for the transaction; was in direct contact with the individual holding the drug proceeds; arranged to meet directly with that person after he or she had provided defendant with the correct serial number; received the drug proceeds in U.S. dollars, in amounts ranging between $30,000 to $150,000 per transaction; and often delivered those proceeds to the person who released an equivalent amount of RMB in China. R. 150 at 4; PSR ¶¶ 10-11. In executing these steps, defendant exercised a strong degree of planning, organizing, and autonomy: He selected the key code words for the transaction; arranged and executed meetings with drug traffickers; independently handled a total of

20

approximately $1.4 million in drug proceeds; and, in at least some circumstances, delivered that money to its final destination. R. 150 at 4-5; PSR ¶¶ 8, 10-11. These are not steps taken by someone playing a minor role in a criminal enterprise.

The fourth factor—the "nature and extent of the defendant's participation in the commission of the criminal activity"—also militates against application of the minor role adjustment. Over a seven-month period, defendant executed between 15 to 20 money pickups, personally accepting more than a million dollars in cash proceeds from narcotics sales. R. 150 at 5. This was an important role, as defendant linked members of the drug trafficking organization seeking to launder funds to members of the money laundering organization executing the "mirror transactions" in China. *Id*. at 4-5. As government explained in its sentencing memorandum: "[D]efendant was no minor bit part in this story—he was a central character." R. 178 at 5. Moreover, defendant does not contest that his role in the conspiracy was similar to the role performed by others. G. App. 6-7 (conspiracy employed multiple couriers like defendant throughout its duration). As a result, the nature and extent of defendant's participation not only made him substantially culpable in the crime, but the fact that others participated in a similar degree demonstrates that defendant was not "substantially less culpable than the

conspiracy's average member," as required for a minor role adjustment. U.S.S.G. § 3B1.2 cmt. 3(A).

In this way, defendant's role here was similar to the role played by the defendant in *United States v. Valcan*, 493 F. App'x 806 (7th Cir. 2012). Over approximately five months, the defendant in *Valcan* utilized false passports and traveled to the United States to receive wire transfers reflecting funds stolen by an entity in Romania. *Id.* at 806-07. Defendant Valcan then wired these funds to the Romanian entity, earning a percent commission for his activities. *Id.* at 807. In total, Valcan laundered approximately $1.4 million for the Romanian entity and received approximately $70,000 as compensation. *Id.* at 806-07. The district court denied Valcan's request for a minor role adjustment, reasoning that although he did not play a leadership role, he "played a significant role that was critical to the success of the criminal scheme." *Id.* at 808. This Court affirmed the district court under a clear error standard. *Id.* at 809. *Valcan* explained that the defendant "left his home in Australia to come to the United States, where he spent almost five months playing an essential role in laundering $1.4 million of stolen money." *Id.* (adding that this was "the entire money-laundering conspiracy, as far as [defendant] can tell us"). And although "Valcan had limited knowledge of the scheme and took home only a percentage of the proceeds," "he provided no

evidence to show that the average participant took home more of the proceeds or had more knowledge." *Id.* Thus, he was no minor player.

The facts of *Valcan* compare favorably to the facts here. Like Valcan, this defendant also played an "essential role in laundering $1.4 million," receiving that money and then facilitating its transfer abroad. *Id.* Like Valcan, this defendant was also compensated based on a percentage commission (although this defendant admittedly earned less than Valcan). *Id.* at 807. Moreover, *unlike* Valcan, this defendant had more than just a "limited knowledge of the scheme." *Id.* at 809. He knew and communicated with other co-conspirators, met personally with drug traffickers, and understood that the money he received reflected drug proceeds. In other words, like Valcan, defendant played a "significant role that was critical to the success of the criminal scheme." *Id.* at 808. The fourth factor thus weighs against defendant.

The fifth and final factor also militates against application of the minor role adjustment. Defendant earned a "percentage fee for each money laundering transaction in which he participated, personally earning approximately $7,500 in total for his services." R. 150 at 5. The more he laundered, the more he made. Defendant thus had a "proprietary interest in the criminal activity." U.S.S.G. § 3B1.3 cmt. 3(C); *see also United States v. Patel*, 746 F. App'x 569, 573 (7th Cir. 2018) (fact that defendant received a "percentage of the earnings—a commission taken off the top, rather than a

salary or a fixed fee" supported the district court's decision not to apply minor role adjustment). Again, he was no minor player.

On this record, the district court did not err in declining to apply a minor role reduction under Guideline § 3B1.2.

### 2. The District Court Sufficiently Explained Its Reasons for Declining To Apply Minor Role Adjustment.

Defendant also contends that the district court erred when it failed to explicitly consider each of the five factors enumerated in the commentary to Guideline § 3B1.2(b). Br. 12 (claiming that the district court "only considered the first factor tangentially" and "glossed over" the remaining four). This argument lacks merit, where this Court has declined to impose upon district courts the procedural duty that defendant articulates.

For purposes of Guideline § 3B1.2, district courts are not required to "state explicit findings on each of [its] enumerated factors." *Campuzano-Benitez*, 910 F.3d at 989. Just as district courts are not required "to treat [§ 3553(a)] sentencing factors  as a checklist or to spell out their analyses of each factor at each sentencing," "[n]othing in § 3B1.2 or its application notes suggests the sentencing judge is required to treat these mitigating role factors differently." *Id.* at 989-90 (quoting *United States v. Panaigua-Verdugo*, 537 F.3d 772, 728 (7th Cir. 2008)). Instead, reviewing courts simply examine the record to ensure that "the district court was aware of the mitigating role

factors." *Id.* at 990. That standard is satisfied where the parties have "argued the issue thoroughly before the court . . . in their position papers and during their sentencing hearings," and where "[w]ith this background, the court explained the facts before it." *Id.* Or as the Ninth Circuit has explained, in language this Court quoted approvingly in *Campuzano-Benitez*, *id.*:

> The district court was not obligated to tick off the [§ 3B1.2] factors . . . to show that it considered them . . . and we have no trouble determining from the sentencing memoranda and the transcript of the sentencing hearing that the district court was well aware of the [relevant] factors.

*See United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018); *accord United States v. Torres-Hernandez*, 843 F.3d 203, 209 (5th Cir. 2016) ("The district court was not required to expressly weigh each factor in § 3B1.2 on the record.").

Here, the record makes clear that the district court was more than aware of the factors relevant to its Guideline § 3B1.2(b) determination. The parties briefed the issue and relevant factors in their sentencing memoranda. R. 158 at 3-4; R. 177 at 1-2. Probation analyzed the issue in the PSR. PSR ¶¶ 24-26. And at the sentencing hearing, the parties again advanced their positions regarding defendant's role in the offense with arguments directly tied to the Guideline § 3B1.2 factors. G. App. 6-8. Operating with the benefit of these arguments and submissions (*id.* at 3-4, 9), the district court declined to impose the minor role reduction, employing language that clearly evinced its

awareness of the relevant factors. It said: "[W]e look to the degree to which he understood the scope and the structure"; "[we look to] the degree to which he participated in the planning"; and "[we look to] . . . of course, the degree to which he exercised authority or influenced the exercise and decision-making authority, the nature and extent of his participation, and then whether he stood to benefit." *Id.* at 8-9. Because the sentencing judge was not required to "treat sentencing factors as a checklist," *Campuzano-Benitez*, 910 F.3d at 989, or to "tick off the factors on the record to show that it considered them," *Diaz*, 884 F.3d at 916, the district court did not commit procedural error.

In support of his argument to the contrary, defendant cites two Ninth Circuit cases: *United States v. Rodriguez*, 44 F.4th 1229 (9th Cir. 2022), and *United States v. Quintero-Leyva*, 823 F.3d 519 (9th Cir. 2016). Br. 12. In addition to the fact that *Rodriguez* and *Quintero-Leyva* are not binding on this Court, neither opinion compels a different conclusion.

In *Rodriguez*, the Ninth Circuit cited *Quintero-Leyva* for the proposition that "district courts must consider *all* of these factors"—meaning, the factors listed in the commentary to Guideline § 3B1.2—"when determining whether to grant a mitigating-role adjustment." 44 F.4th at 1233. *Rodriguez* went on to find error by the district court not because it failed to consider each of the five factors, but because of the factually untethered manner in which it did so. *See, e.g.*, *id.* at 1236 (with respect to the first factor, holding that "the district court

26

appeared to conclude that a larger drug trafficking organization was involved in the offense"); *id.* at 1237 (with respect to the fifth factor, holding that "the district court did not consider that [defendant] was to be paid a fixed amount to perform a discrete task"). In *Quintero-Leyva*, the appeals court found error as well, but because it could not "determine for the record whether the court considered all of the factors." 823 F.3d at 523-24.

The errors at issue in *Rodriguez* and *Quintero-Leyva* are not at issue here. As explained above, the district court clearly considered each factor and in a substantively proper manner. Moreover, *Rodriguez* and *Quintero-Leyva* do not undermine the Ninth Circuit's decision in *Diaz*, which defendant does not even acknowledge but which makes clear that "the district court need not recite each factor to show it has considered them." 884 F.3d at 916. *Quintero-Leyva* predated *Diaz*, and *Rodriguez* cited *Diaz* approvingly throughout. 44 F.4th at 1233, 1235-37.

Because the record here reflects that the district court was well aware of each of the relevant factors and considered them when denying defendant a minor role adjustment under § 3B1.2, no procedural error occurred.

## III. Defendant's Ineffective Assistance of Counsel Claim Is Premature and Lacks Merit.

### A. Standard of Review

Defendant did not raise his ineffective assistance of counsel claims before the district court, and therefore, this Court reviews for plain error. *United States v. Cates*, 950 F.3d 453, 456 (7th Cir. 2020) (citing Fed. R. Crim. P. 52(b)); *United States v. Flores*, 739 F.3d 337, 341 (7th Cir. 2014).

The plain error standard is a "demanding one." *Flores*, 739 F.3d at 341. "[T]here must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.'" *United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.*

### B. Analysis

#### 1. Defendant's Claim Is Premature, and He Has Waived a Request To Remand for an Evidentiary Hearing.

This Court is generally "reluctant to hear ineffective assistance of counsel claims on direct appeal." *United States v. Ruzzano*, 247 F.3d 688, 696 (7th Cir. 2001), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016); *United States v. Stuart*, 773 F.3d 849, 850 (7th Cir. 2014) ("Ordinarily it is imprudent to raise on direct appeal a claim of ineffective

assistance if, as is usually the case, the record is not developed."); *Flores*, 739 F.3d at 341 ("[W]e have said many times that it is imprudent to present an ineffective-assistance argument on direct appeal."). This is due to the fact that, *inter alia*, "when an ineffective-assistance claim is brought on direct appeal . . . the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose." *Massaro v. United States*, 538 U.S. 500, 505 (2003).  As this Court has explained: "After *Massaro*, only the rarest and most patently egregious of ineffective assistance claims are appropriately brought on direct appeal because there is no risk to delaying until a fully developed record is made." *United States v. Harris*, 394 F.3d 543, 558 (7th Cir. 2005).

Further, there is "danger" to bringing an ineffective assistance of counsel claim "too soon." *Id.* "The best that could come of an appeal (from the defendant's perspective) would be a remand for a hearing—duplicating the process initiated by a motion under [28 U.S.C. § 2255]." *Flores*, 739 F.3d at 340. At such a hearing, the purportedly ineffective counsel could explain his or her strategic choices, could testify "that he did tell his client [about the strategy] and that the client listened impassively . . . or approved, or perhaps counsel might explain why he overrode his client's objection." *Id.* Ultimately, "[a] district judge then could determine who was telling the truth, make appropriate findings, and decide whether the defense had been conducted in a

professionally competent way." *Id*. But where—as here—a defendant's opening brief does not request a remand for an evidentiary hearing on his ineffective assistance claim, that request is waived. *Harris*, 394 F.3d at 559.

Another possible (and worse for the defendant) outcome "would be an affirmance observing that an empty record is fatal to the appeal." *Flores*, 739 F.3d at 340. Such an adverse decision on the merits of the claim "will be binding on the district court through the law of the case doctrine" should defendant later seek collateral review of his sentence. *Harris*, 394 F.3d at 558; *Flores*, 739 F.3d at 341-42 ("By arguing ineffective assistance on direct appeal the defendant relinquishes any opportunity to obtain relief on collateral review, even though a motion under § 2255 affords the only realistic chance of success.").

Under circumstances like those present here, this Court has advised that defendants may withdraw their ineffective assistance claim and save it for a later post-conviction motion under § 2255. *Flores*, 739 F.3d at 342 ("Ever since *Massaro* the judges of this court have regularly asked counsel at oral argument whether the defendant is personally aware of the risks of presenting an ineffective-assistance argument on direct appeal and, if so, whether defendant really wants to take that risk.").

## 2. Defendant's Counsel at Sentencing Did Not Render Ineffective Assistance.

Assuming this Court proceeds to the merits of defendant's ineffective assistance of counsel claim, that claim fails.

### a. Applicable Legal Principles.

To prevail, defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984), and show: (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."

In the sentencing context, "[t]he performance prong applies the same way for sentencing performance as it does for trial performance: the petitioner must show that counsel's performance fell below an objective standard of reasonableness." *Resnick v. United States*, 7 F.4th 611, 625 (7th Cir. 2021). In evaluating an attorney's performance, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]" and its "scrutiny of counsel's performance must be highly deferential[,]" making "every effort . . . to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. *See also United States v. Trevino*, 60 F.3d 333, 338 (7th Cir. 1995) (because "counsel is presumed effective," "a party bears a heavy burden in making out a winning claim based on ineffective

assistance of counsel"). Where there is no record, defendant's burden becomes even heavier. "As a practical matter, that presumption cannot be overcome without an evidentiary hearing at which the defendant explains his view of what went wrong and counsel can justify his choices." *Flores*, 739 F.3d at 340; *see also id.* (ineffective assistance claims on direct appeal are generally "doomed unless the contention is made first in the district court and a full record is developed").

With respect to the prejudice prong, defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *United States v. Starnes*, 14 F.3d 1207, 1210 (7th Cir. 1994).

### b.     Defense Counsel's Performance Was Not Deficient.

Here, defendant argues ineffective assistance of counsel at his sentencing hearing in two regards: his counsel's advocacy regarding the application of Guideline § 3B1.2(b) and his counsel's advocacy regarding his mitigation arguments. Br. 15. Even ignoring the heightened burden imposed by the plain-error review applicable here, defendant cannot establish deficient performance in either regard.

With respect to the minor role adjustment, defendant's sentencing counsel did not perform deficiently. He objected to the PSR's refusal to apply the § 3B1.2(b) reduction; filed a sentencing memorandum explaining why the

reduction applied; and advocated for application of the reduction at sentencing. R. 177 at 1-2; G. App. 6. In so doing, defense counsel referenced the relevant factors enumerated in the commentary to Guideline § 3B1.2. *Contra* Br. 15 (arguing that "defense counsel did not address *any* of these five factors") (emphasis in original). For example, in his sentencing memorandum, defense counsel highlighted that defendant's participation ran only for a portion of the conspiracy, that he did not "control the electronic money transfers, nor the conversion of the money to different currencies or property," and that he was merely an "intermediary who picked up the money and dropped it off." R. 177 at 1-2. At the sentencing hearing, defense counsel similarly stressed that defendant's involvement in the crime was limited in time ("my client was involved for seven months") and scope ("he did not organize the conspiracy"). G. App. 6.

On appeal, defendant claims that this performance "falls below an objective standard of reasonableness," but he does not actually articulate what other arguments defense counsel could have advanced with regards to his minor role. Br. 15. Instead, he simply concludes that, in light of defense counsel's presentation, the district court "failed to properly consider" the five factors associated with Guideline § 3B1.2(b). Br. 18. Yet, as set forth above, the record belies that contention where the district court was well aware of the relevant factors and expressly referenced them. *See supra* at 24-27.

With respect to mitigation arguments, defendant's sentencing counsel similarly did not perform deficiently. In defendant's sentencing memorandum, counsel highlighted:

- defendant's lack of criminal history and the fact that he "is not in any way a risk of further criminality"

- his efforts to cooperate with law enforcement;

- the burden a lengthy sentence would impose on defendant's family, which includes his wife, two children, and "ailing father";

- the fact that defendant moved to Colorado in 2017 to keep the family restaurant "afloat during his father's incapacity and to provide for his family"; and

- the fact that defendant "voluntarily divorced himself from the conspiracy long before it ended."

R. 177 at 2-3. At the sentencing hearing, defense counsel reiterated these points, again highlighting defendant's efforts to cooperate with law enforcement, the lack of a recidivism risk that defendant presented, his limited role in the conspiracy and his decision to withdraw voluntarily, his life in Colorado working and supporting his family, and the burden that any period of incarceration would impose on his family, including his two children. G. App. 14-15.

On appeal, defendant identifies 14 items that, he maintains, defense counsel should have raised at sentencing had he been performing effectively.[2] But many of these items—in particular, those relating to his family circumstances—*were* covered in defendant's sentencing memorandum and presentation at the sentencing hearing. *See, e.g.*, R. 177 at 2-3 (discussing defendant's family, father, and work at the family restaurant); G. App. 15 (defense counsel explained that defendant has two children, "lives with his parents," and "helps run the family restaurant" which is "owned by his

---

[2] These items are:

1. Defendant came to the United States with his family in 1997 when he was 17 years old;
2. Defendant worked at restaurants as a teenager to help support his family;
3. Defendant became a naturalized citizen of the United States in 2005;
4. Defendant graduated from the University of Colorado Boulder in December 2006 with a Bachelor of Science degree in business administration;
5. Defendant lived in Chicago from 2007 to 2017 when he returned to Colorado to help care for his ailing father;
6. Defendant's father is 80-years old and is a retired restaurant worker who suffers from lupus and diabetes;
7. Defendant's mother owns the family restaurant;
8. Defendant has two siblings;
9. Defendant has an excellent relationship with his parents and two siblings;
10. Defendant married his wife in 2013 and his wife is supportive of defendant;
11. Defendant and his wife have two young children, ages eight and six;
12. Defendant does not have a history of substance abuse;
13. Defendant lives with his elderly parents, wife, and their two young children and works in the family restaurant; and
14. Defendant "is a 39-year-old first-time non-violent offender who poses absolutely no threat or risk of re-offending in light of his conduct over the past six years while free on bond."

Br. 15-16.

parents"). In addition, the PSR, which the district court reviewed, G. App. 3-4, covered the first 13 of these 14 items. PSR ¶ 46 (Items 1 and 2); PSR ¶ 51 (Item 3); PSR ¶ 59 (Item 4); PSR ¶ 50 (Item 5); PSR ¶ 44 (Items 6-8); PSR ¶ 45 (Item 9); PSR ¶ 48 (Item 10); PSR ¶ 49 (Item 11); PSR ¶ 57 (Item 12); PSR ¶ 62 (Item 13).

And regarding Item 14, which is more argumentative than factual in nature, that point featured significantly both in defendant's sentencing memorandum and during defense counsel's argument at sentencing. R. 177 at 3; G. App. 14 ("Obviously, re-offending isn't an issue because, in the last five years, he's had no interactions with these people or with this whole situation."). It was echoed by the government. G. App. 11-12 ("But certainly his lack of criminal history, and I think, in particular, his good conduct since the criminal conduct in this case . . . evidences that he's not a danger to the community."). And it ultimately formed a basis of the district court's decision to impose a below-Guidelines sentence. G. App. 17 ("Now, the history and characteristics of you show me that you haven't had a criminal history. And you certainly are contrite about what you did.").

In other words, on appeal, defendant faults his counsel in the district court for not bringing to the court's attention pieces of information that counsel either already highlighted for the district court or that the district court would have already known based on its review of the PSR. Defense counsel

reasonably and strategically could have decided not to reiterate information concerning defendant's background in the interest of brevity or succinctness, or to focus the district court's attention on stronger arguments in favor of mitigation. *See United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003) ("[T]here is a tactical reason not to make weak arguments," as "they may distract the court from the strong arguments and as a result make it less likely to rule in the defendant's favor."); *accord United States v. Brodie*, 507 F.3d 527, 532 (7th Cir. 2007). As this Court has previously explained, its "task" is not "to second-guess counsel's judgment and replace it with [its] own." *United States v. Lathrop*, 634 F.3d 931, 937 (7th Cir. 2011). "So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally 'cannot support a claim of ineffective assistance of counsel.'" *Id.* (quoting *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005)).

Defense counsel may have also made a decision not to highlight certain items—specifically, Items 1 through 4 and 7 through 13—because the court could have viewed them as aggravating rather than mitigating. *See United States v. Hancock*, 825 F.3d 340, 345-46 (7th Cir. 2016) (sentencing court considered defendant's efforts to mitigate the seriousness of his offense, but viewed the claim as aggravating instead; "[the judge] disagreed, as she was entitled to do"). For example, while defendant's college degree could be viewed

as a strong indicator that he is unlikely to reoffend, at the sentencing hearing, the government highlighted the fact that defendant "had a good life, and he had opportunities that most defendants who appear in front of [the district court] do not," adding that "in that sense, . . . his history and characteristics are aggravating." G. App. 11. Defense counsel may very well have made the strategic choice not to highlight defendant's background extensively to blunt that anticipated government argument.[3]

### c.    Defendant Cannot Establish Prejudice.

Even assuming defense counsel provided ineffective assistance at sentencing, defendant cannot establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Starnes*, 14 F.3d at 1210.

Although the district court ultimately declined to apply the reduction available under Guideline § 3B1.2(b), it did so after considering all of the pertinent information provided to it by defense counsel (and which defendant, on appeal, does not augment) and in light of all the relevant factors identified

---

[3] Defendant also faults counsel for failing to cite *Gall v. United States*, 552 U.S. 38 (2007), arguing that the factual circumstances in *Gall* were similar to the circumstances here. Br. 16. However, sentencing is a highly fact-intensive inquiry where it is difficult to draw parallels between different cases and different defendants. Notably, there are some significant differences between *Gall* and this case, including that the advisory Guidelines range in *Gall* was 30-37 months imprisonment, whereas here, defendant was facing an advisory guidelines range of 87 to 108 months. *Gall*, 552 U.S. at 43.

in the Guidelines commentary. With respect to mitigation, the district court already knew the information defendant highlights on appeal. It is unclear how defendant would have benefited in any material fashion had his counsel essentially re-read the entirety of paragraphs 44 through 52 of the PSR. In addition, many of the purportedly new items of information that defendant highlights on appeal concern his history of employment, the support of his family, his college education, and his lack of a history of substance abuse. Br. 15-16. These arguments are "generic or 'stock' arguments that required no mention by the district court because they do not distinguish [this defendant] from many other defendants." *See United States v. Chapman*, 694 F.3d 908, 916 (7th Cir. 2012); *see also United States v. Russell*, 662 F.3d 831, 854 (7th Cir. 2011) ("college education, job skills, age, marital status, and lack of history of drug abuse are neither remarkable nor so compelling as to call into question the reasonableness of a below-Guidelines sentence"). It is therefore difficult, if not impossible, to see how defendant's sentencing would have turned out differently had defense counsel highlighted these items at the hearing.

Furthermore, the district court made clear that the "number one factor" in mitigation was defendant's attempts to cooperate with the government and provide truthful information to law enforcement and the fact that defendant had not re-offended since disengaging from the conspiracy. G. App. 17-18. Defense counsel astutely predicted the district court's priorities and focused

39

his sentencing argument on these two exact issues. *Id.* at 14. Particularly where defendant received a significantly below-Guidelines sentence, defendant has not established that the result of his sentencing would have been different.

## CONCLUSION

For these reasons, the government respectfully requests that this Court affirm defendant's conviction and sentence.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

/s/ *Jonathan L. Shih*
JONATHAN L. SHIH
Assistant United States Attorney

## RULE 32 CERTIFICATION

I hereby certify that:

1. This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 9,276 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ *Jonathan L. Shih*
       JONATHAN L. SHIH
       Assistant United States Attorney
       219 South Dearborn Street, 5th Floor
       Chicago, Illinois
       (312) 353-5361

In the

# UNITED STATES COURT OF APPEALS

for the Seventh Circuit

---

# No. 22-2349

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**XUAN TAM,**

**Defendant-Appellant.**

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 19 CR 158 — Virginia M. Kendall, *Judge*.

---

# APPENDIX OF THE UNITED STATES

---

JOHN R. LAUSCH, JR.
United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

JONATHAN L. SHIH
Assistant United States Attorney

# TABLE OF CONTENTS

Sentencing transcript – *United States v. Tam*, 19 CR 158 ................................................ G. App. 1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )  Docket No. 19 CR 00158-5
                                      )
 4                  Plaintiff,        )  Chicago, Illinois
                                      )  July 19, 2022
 5           v.                       )  9:56 a.m.
                                      )
 6   XUAN TAM,                        )
                                      )
 7                  Defendant.        )

 8
                     TRANSCRIPT OF PROCEEDINGS - Sentencing
 9              BEFORE THE HONORABLE VIRGINIA M. KENDALL

10
     APPEARANCES:
11

12   For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                              MR. SEAN FRANZBLAU
13                            Assistant United States Attorney
                              219 South Dearborn Street, 5th Floor
14                            Chicago, IL  60604

15
     For the Defendant:       GOTTREICH GRACE & THOMPSON by
16                            MR. MARC E. GOTTREICH
                              311 West Superior
17                            Suite 215
                              Chicago, IL  60654
18

19   Also Present:           MS. KELLY KWONG
                              U.S. Probation Office
20

21

22   Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Official Court Reporter
23                            219 S. Dearborn Street, Room 2504
                              Chicago, IL 60604
24                            312.435.6047
                              gayle_mcguigan@ilnd.uscourts.gov
25
```

1      (In open court.)

2              THE CLERK:  19 CR 158, Defendant 5, U.S. versus Xuan

3      Tam.

4              Please present yourselves.

5              MR. FRANZBLAU:  Good morning, your Honor.  Sean

6      Franzblau for the United States.

7              THE COURT:  Good morning.

8              MR. GOTTREICH:  Marc Gottreich for Mr. Tam.

9              THE COURT:  Good morning, Mr. Gottreich.

10             Good morning, Mr. Tam.  Good morning.

11             THE DEFENDANT:  Good morning.

12             PROBATION OFFICER:  Good morning, your Honor.  Kelly

13     Kwong on behalf of the Probation Office.

14             THE COURT:  Good morning, Ms. Kwong.

15             And thank you for your very thorough report.  I

16     appreciate it.

17             PROBATION OFFICER:  Thank you, your Honor.

18             THE COURT:  For purposes of today's hearing, while you

19     are speaking, you can take your mask down.  It's best to keep

20     it up for the rest of the time.  And that is assuming you are

21     vaccinated.  If you're not vaccinated, do not take your mask

22     down.  Okay?  Especially with this new Omicron 5, whatever

23     variant, it's spreading like wildfire.

24             So, Mr. Tam, this is how we're going to proceed.

25             First, I'm going to go through the report and what I

1   have in front of me to see if there's any factual changes.

2         Then I'm going to calculate a sentencing guideline

3   calculation.  That's just advisory in nature, but I still have

4   to do it before I go into the next phase.

5         The next phase is I'm going to look at the statute.

6   And those factors include the seriousness of the offense and

7   the need to impose a sanction that reflects that; the history

8   and characteristics of you; the need to prevent you from

9   committing another crime; the need to prevent the public from

10   committing a crime like this, so a general deterrence; and I

11   need to promote respect for the rule of law with my sentence.

12   I also will take into account any unwarranted sentencing

13   disparities, any need for restitution or forfeiture.  And then,

14   finally, just personal characteristics that might need

15   attention as part of your sentence.

16         So once we do that, the prosecutor will go first.  The

17   defense attorney will go second.  And then you will have an

18   opportunity to speak, if you would like to.  And then I'll

19   impose sentence.  Okay?

20         All right.  So let's get started.

21         I have in front of me, first, Ms. Kwong's report from

22   April 12, 2022.  I have a subsequent supplemental report from

23   June 8th of 2022.  And her sentencing recommendation from June

24   8 of 2022, which supersedes, I believe, the April 12, 2022,

25   sentencing recommendation.

1          And then I have the defendant's sentencing memorandum,

2     the preliminary order of forfeiture which was entered, and the

3     government's sentencing memorandum.

4          Is there anything else that either of you have

5     submitted that I have not reviewed?

6          MR. GOTTREICH:  No, Judge.

7          MR. FRANZBLAU:  No, your Honor.

8          THE COURT:  Okay.  So as far as the report is

9     concerned, Mr. Gottreich, do you have any factual changes to

10     the report?

11          MR. GOTTREICH:  Judge, I do not.  I have reviewed both

12     reports with my client, and there are no factual changes.

13          THE COURT:  Okay.  How about for Mr. Franzblau?

14          MR. FRANZBLAU:  No changes, your Honor.

15          THE COURT:  Okay.  So then, Ms. Kwong, I'll adopt the

16     report as written, and we'll move into the sentencing

17     calculation.  And we'll do the guideline calculation first.

18          So Ms. Kwong has calculated a base offense level of 22

19     for the conspiracy to commit money laundering.  And that's

20     based upon a 14-level increase because of the amount being

21     between $550,000 and less than 1.5 million.

22          Any objection from either side to that base offense?

23          MR. FRANZBLAU:  No, your Honor.

24          MR. GOTTREICH:  No, Judge.

25          THE COURT:  Okay.  And then she's also added a

1    six-level increase because the defendant knew that the proceeds

2    he collected and delivered were from the sale of narcotics.

3    And that was based upon conversations and the covert nature of

4    the pick-ups and the arrests, et cetera.

5              Any objection to that?

6              MR. GOTTREICH:  No, Judge.

7              MR. FRANZBLAU:  No, your Honor.

8              THE COURT:  Okay.  And then she has calculated a

9    two-level increase, and that is because you are convicted under

10   18 U.S.C. 1956.

11             Any objection to that?

12             MR. GOTTREICH:  No, Judge.

13             THE COURT:  Okay.  And then, finally, she's added two

14   levels because of the sophisticated nature of the laundering

15   operation.

16             Any objection to that?

17             MR. GOTTREICH:  No, Judge.

18             THE COURT:  Okay.  She did not give an adjustment for

19   role in the offense.  She determined that the actors in the

20   offense were -- did I say offense or defense?

21             She did not give an adjustment for role in the offense

22   because she did not determine that anyone was more or less

23   culpable.

24             Any objection to that?

25             MR. GOTTREICH:  Judge, we did object to that in our

1    sentencing memorandum.

2            THE COURT:  Go right ahead.

3            MR. GOTTREICH:  Judge, this offense for the whole

4    conspiracy went on for a number of years.  My client was

5    involved for seven months.  And his participation, we believe,

6    was minor based on that.  He did not organize the conspiracy.

7    He was a player in the conspiracy, obviously, but he did not

8    organize it.  He was just, as the government put forth, one

9    level of the entire conspiracy.

10            So for that reason, Judge, we'd ask that it be a minor

11    player.

12            THE COURT:  So, primarily, you're distinguishing on

13    the length of time --

14            MR. GOTTREICH:  Yes.

15            THE COURT:  -- and the amount of money that he

16    laundered.

17            MR. GOTTREICH:  Yes.

18            THE COURT:  Go ahead.

19            MR. FRANZBLAU:  Your Honor, the defendant is not

20    substantially less culpable than his other participants.  He

21    was a courier in the organization.  And all of the other

22    couriers were also involved for truncated periods of time.

23    They sort of jumped in at different parts of the conspiracy

24    and -- because they were replacing each other.  It started out

25    with Weishe Tan.  Then it was the defendant.  And then it was

1    Denny Zheng.  So they all share the similar amount of time.

2    Weishe Tan was involved for the longest.  But Zheng is similar

3    to Tam in that he was involved for a period of several months

4    as opposed to years.

5          The defendant is not even the least culpable courier

6    in terms of the amount of money laundered.  Denny Zheng is.

7    And I think that your Honor could find that that, just on its

8    face, precludes the application of this adjustment.

9          But the adjustment is inappropriate for a few other

10   reasons.

11         The extent and nature of the defendant's

12   involvement -- I mean, this was continuous, ongoing conduct for

13   seven months.  He was involved in 15 to 20 money pick-ups, your

14   Honor.

15         And it wasn't just the physical transfer of cash.

16   They went through an elaborate procedure to engage in the

17   secure transactions between the money laundering organization

18   and the drug trafficking organization.  The defendant was

19   central to passing the information needed to conduct the secure

20   transaction and then, at the other end, he's transferring money

21   to the brokers who conduct the mirror transactions.  And,

22   again, he's deeply involved in that.  He's passing the Chinese

23   bank account information, and then he's passing the wire

24   transfer receipts to the leaders in Mexico.

25         So he has a depth of involvement that goes on just

1  beyond physically transporting things that I think that this

2  mitigating role reduction sort of envisions.

3          On top of that, he understands the scope and structure

4  of the organization.  He knew that the funds were going through

5  China for purposes of laundering them, and that they were

6  ultimately being remitted to the cartel in Mexico.

7          And, furthermore, he was profiting at the exact same

8  amount as his co-conspirators.  They were each earning this .5

9  commission.

10          So because of that, it's just -- the facts don't

11  support that he's substantially less culpable.

12          THE COURT:  Okay.  Did you want to reply to his

13  argument?

14          MR. GOTTREICH:  No, Judge.

15          THE COURT:  Okay.  I do think Mr. Franzblau is correct

16  regarding that fact-based determination, because we look to the

17  degree to which he understood the scope and the structure, and

18  he certainly did --

19          (Brief interruption of the proceedings.)

20          THE COURT:  -- oh, thank you -- the degree to which he

21  participated in the planning.  And then, of course, the degree

22  to which he exercised authority or influenced the exercise and

23  decision-making authority, the nature and extent of his

24  participation, and then whether he stood to benefit.  And all

25  of the factors that Mr. Franzblau just said really favor the

1    enhancement being given.

2         So, over objection, I will -- not enhancement, excuse

3    me.  The lack of reduction being -- now I'm going to a double

4    negative.  I must need that cup of coffee this morning.

5         (Laughter.)

6         THE COURT:  I don't think the reduction is appropriate

7    based upon the factual statements that Mr. Franzblau just made.

8         Okay.  There, that's a little better.

9         Now, let's turn to -- you do get acceptance of

10   responsibility.  And that's a three-level reduction.  Correct?

11        MR. FRANZBLAU:  Correct, Judge.

12        THE COURT:  For some reason, I don't see your

13   reduction for acceptance -- oh, you didn't give it.  Is that

14   correct, Ms. Kwong?

15        PROBATION OFFICER:  No.  There's a three-level

16   reduction in the supplemental report, your Honor.

17        THE COURT:  Oh, is that what it is?  Okay.  All right.

18   I'm looking at the original.  Thank you.

19        Okay.  That's the change.  Thank you.  I remember

20   that.

21        I read these usually about five days beforehand and

22   then review in the morning, so now I remember that.

23        Okay.  So what that means is that the supplemental

24   report gives you a total offense level of 29.

25        And then you have a criminal history category of I.

1          And the guideline range is 87 months to 108 months in

2    prison.

3          Is everyone in agreement that that's the, now that

4    I've made that ruling, that that's the calculation?

5          MR. GOTTREICH:  Yes, Judge.

6          MR. FRANZBLAU:  Yes, your Honor.

7          THE COURT:  Okay.  So now we'll turn to the next phase

8    of the sentencing hearing, which is applying the statute, which

9    are those factors that I just mentioned to you.

10         So, Mr. Franzblau, please tell me where you believe he

11    should be sentenced.

12         MR. FRANZBLAU:  Thank you, Judge.

13         Beginning with the nature and circumstances of the

14    offense, again, this was repeat, continuous conduct that went

15    on for seven months.  And the defendant, on 15 or 20 different

16    occasions, was picking up substantial amounts of cash from drug

17    traffickers and making sure, in a very important way, that that

18    money got back down to the cartels.

19         Why is that conduct so serious?

20         It's because the cartels are the world's most

21    dangerous, violent criminal organizations.  And they absolutely

22    rely upon the remittance of proceeds to not only, you know,

23    recoup their profits, but to reinvest and to deepen and

24    continue their pernicious trade.  And anyone who helps the

25    cartel in any way has to face the most severe of penalties.

Case: 22-2349    Document: 16    Filed: 01/04/2023    Pages: 75

1       You know, there's -- we talk about non-violent drug

2   crimes.  There really is no such thing as a non-violent drug

3   crime.  It's how many levels removed you are from the violence,

4   because it -- the drug trade is something that is sustained by

5   and fuels unspeakable levels of violence.

6       And the defendant certainly was not involved in

7   violence directly.  But anyone who assists these organizations

8   must be held accountable to a meaningful degree, just because

9   of the foreseeable human consequences:  The drug addicts who

10  suffer under the grip of addiction, family members and friends

11  of the communities, the degradation that goes on in the

12  communities, and the violence that we see from, you know, the

13  streets of Chicago to the countrysides of Mexico, and the

14  terror that goes on in that country.

15      Again, I don't mean to be hyperbolic here, but anyone

16  who assists the cartels does bear meaningful responsibility for

17  that.  And it needs to be reflected in a severe punishment.

18      You know, turning to the defendant's history and

19  characteristics, there's not much in his background that

20  explains how he got involved in this.  I mean, he had a good

21  life, and he had opportunities that most defendants who appear

22  in front of your Honor do not.  So, in that sense, I think that

23  his history and characteristics are aggravating, in a sense.

24  But certainly his lack of criminal history, and I think, in

25  particular, his good conduct since the criminal conduct in this

1    case -- which is rather dated, it's over five years old -- I

2    think, you know, evidences that he's not a danger to the

3    community.  He's unlikely to re-offend.  And so I do think a

4    below guidelines is appropriate.  And I think a fairly

5    substantial dip, as you see from our recommendation of 65

6    months, is appropriate here, particularly since this is going

7    to be the defendant's first time in prison.

8              In terms of the (a)(2) factors, your Honor, I think,

9    again, that the need to punish and promote respect for the law,

10   just the seriousness of dealing with the cartels and helping

11   them in this critical way that they reply upon, I also feel

12   that general deterrence is a very powerful factor here.  The

13   defendant is part of a relatively recent phenomenon in which

14   Chinese ex-patriots living in Mexico and their associates in

15   the United States have really taken over the global money

16   laundering trade.  And it started with remittance networks that

17   were used to send back legitimate proceeds earned in the

18   United States and Mexico to China.  And China has strict

19   currency outflow limits.  So they were doing these currency

20   swaps to get money home.  Of course, the cartels learned about

21   that, and they got their claws into it.  And they have now, you

22   know, used the system.  And it's incredibly fast.  It's

23   incredibly efficient.  There is actually no money crossing

24   physical borders, so there's no paper trail.  So it's -- it

25   poses an incredible danger.  It's allowed the cartel to lower

1  their expenses and increase the speed at which they get their

2  profits back down to Mexico, and that just deepens their grip

3  in so many ways.

4       So it is important, and I notice -- I've become

5  immersed in this world -- that many of the defendants that I

6  talk to sort of have this idea that, well, I was just handling

7  the money so I -- somehow, it's not as culpable.  And there's

8  this sort of see no evil/hear no evil, sticking the head in the

9  sand.  And that's got to stop.

10       Drug trafficking, money laundering, I said in my

11  sentencing memo, it's the same -- two sides of the same

12  malignant coin.  The one cannot exist without the other.

13       And it needs to be communicated in the sentences that

14  money laundering is going to be treated -- is going to be

15  treated just as seriously as drug trafficking, to send that

16  message out.

17       And because this phenomenon exists in a relatively

18  close-knit ex-patriot community, I do think there's an

19  opportunity here for the -- it's going to resonate in a way

20  that in other cases it won't.  So I do think that general

21  deterrence is actually a very compelling factor here.

22       But, again, ultimately, the directive from Congress is

23  sufficient, but not greater than necessary.  And given the

24  mitigation here, I do think that 65 months is the appropriate

25  balance.

1   THE COURT:  Okay.  And then I think, pursuant to the

2   plea agreement, he has a $7,500 personal money judgment, right?

3   MR. FRANZBLAU:  That's correct.  Thank you, Judge.

4   THE COURT:  Sure.  Okay.  Go ahead, Mr. Gottreich.

5   MR. GOTTREICH:  Thank you, your Honor.

6   I want to go back a little bit to when Mr. Tam was

7   first contacted by federal law enforcement.  That was a few

8   years back.  He talked honestly and openly with law enforcement

9   officers.  When he was told to come to Chicago to face these

10  charges, he came here.  He never tried to evade the Court.

11  And, in fact, as the government indicated, there were two

12  proffers where he was truthful.  Unfortunately, he did not give

13  information sufficient for a 5K1, but he was truthful, and he's

14  come clean with everything that's happened.

15  Further, Judge, and as the government noted, this is a

16  crime that happened five years ago.  Since those five years,

17  he's lived with his family in Colorado.  He's worked.  He's

18  supported his family.  Obviously, re-offending isn't an issue

19  because, in the last five years, he's had no interactions with

20  these people or with this whole situation.

21  My client participated in this conspiracy for seven

22  months.  I believe it went on for five years.  So although your

23  Honor did not believe he was a minor player, looking at it in

24  totality, he was not involved that long.  And I think pursuant

25  to his proffers, he left this whole operation because he knew

1   it was wrong, and he went back to his family in Colorado.

2   That's someone who is contrite, who knows he did wrong, and

3   someone who has come to this Court knowing that he will be

4   punished for what he's done.  We've gone through these --

5   through the calculations and the guidelines, and he knows

6   penitentiary is something that he's looking at, and he knows --

7   he came back to that to answer for what he had did -- what he

8   had done.

9        Any term of incarceration will be a burden on his

10  family, obviously.  He has two children.  He lives with his

11  parents.  As you can see from the report, he basically helps

12  run the family restaurant.  It's a small restaurant owned by

13  his parents.  But his wife, his kids help out.  He works there

14  quite a bit.  So any period of incarceration, for the family at

15  least, would be burdensome.

16       I understand the government's position that a message

17  needs to be sent.  But, in this situation, Judge, we would ask

18  for a significant below-guideline sentence based on what he has

19  done and not done since the offensive behavior.

20       And, of course, we are seeking time for him to

21  surrender.

22       THE COURT:  Any reply?

23       MR. FRANZBLAU:  No, your Honor.  Thank you.

24       THE COURT:  All right.  So, Mr. Tam, you do have the

25  right to address the Court, if you would like to.

1    Would you like to say something, sir?

2    THE DEFENDANT:  Sure.  Yeah.

3    MR. GOTTREICH:  You can stand back.

4    THE DEFENDANT:  I'm sorry what I have been done for

5    this while back.  But since I make a decision, leave Chicago,

6    going back to Denver, so I -- I -- I just want to start new

7    life over there.  Then -- then I just -- you know, leave out

8    all the contacts so nobody can able to, you know, contact me or

9    whatever, I been done here.  So -- so I just want to start a

10    new life back -- back home with my family.

11    THE COURT:  Okay.  All right.  Thank you, Mr. Tam.

12    Now I'm going to impose sentence.  And I'm going to

13    review those factors that I mentioned to you at the beginning

14    of the hearing.

15    The seriousness of the offense is always the place to

16    begin.  And I think Mr. Franzblau said it quite eloquently.

17    Imagine what would happen if the cartels did not have the

18    ability to launder the money and use it.  They wouldn't be able

19    to do the work that they do.  And they wouldn't be doing the

20    work that they do.

21    It is shocking to see what the cartels have done to

22    Mexico and the number of murders linked to the cartels in

23    Mexico.  I think Mr. Franzblau is correct that the violence

24    that is at the front end of this operation is just

25    overwhelming.

1     And it does -- it doesn't help to simply say, "Oh, I

2  was just taking part of something as clean as clicking a few

3  clicks on a computer," or whatever it was you were doing to

4  transfer the money, and say "I'm not a part of it," because you

5  were aiding and abetting their work.  And their work is bloody,

6  and it's horrible.

7     And on this end, in Chicago, the cartel drugs have an

8  impact on our community like nobody else.  The drugs that the

9  community uses keeps fathers from being fathers, employees from

10  being employees, sons from being sons, daughters from being

11  daughters, mothers from being mothers, because they become

12  addicted.  They become addicted to the drug, and then they just

13  completely fail to contribute to a society that is fruitful and

14  beneficial to all of us.  And, instead, they become a burden on

15  all of those people, and they cause tremendous sadness in those

16  families, and they harm themselves and others.

17     So the work of the cartel cannot be aided.  It can't

18  be helped.  It can't be in any way supported by helping them

19  get their money back to them as quickly as you were doing.  And

20  so it's an extremely serious offense.

21     Now, the history and characteristics of you show me

22  that you haven't had a criminal history.  And you certainly are

23  contrite about what you did.

24     I think the number one factor that weighs in your

25  favor is that, once you did proffer, it's been five years and

you haven't gone back to this illegal activity or other illegal

activity.  And that is mitigating to me when I view this.

As far as promoting respect for the rule of law and

general deterrence, these are concepts that seem foreign to a

defendant standing in front of me because it doesn't take into

account you so much as it takes into account my role in the --

setting a sentence that sends a message to all of those in the

community.  And it's something that is very critical for the

public to understand, when I sentence someone, that I

understand the seriousness of the offense, that I sanction

appropriately equating the seriousness of the offense, so that

when someone reads that sentence, they say, "Oh, that's

appropriate, that is the way this sentence should have come

out."  If I sentence you to too high, someone will say, "Well,

boy, that was harsh, you know, I don't know if that seems

appropriate."  And if I sentence you to too low, someone might

say, "Well, that's such a slap on the wrist for such a serious

crime."  So I'm always looking for the correct sentence that

says to the public, "This is a sentence that should say to you,

you cannot aid the cartels in any way, shape, or form.  They

have a violent and horrific impact on our communities here and

abroad, and we can't participate in it."  So that's the

sentence I'm seeking.

Now, you're the first one, right, to be sentenced.  So

I'm not going to worry about a sentencing disparity within

1    your -- your case itself.  But looking at other cases, we can

2    look at the sentencing guideline range as a reasonable range of

3    87 to 108 months and understand that that is something that is

4    where we should be looking.

5         Now, to the government's credit, Mr. Franzblau is

6    seeking a sentence of 65 months, which is below the guideline

7    range.  So he's actually weighed the factors from his

8    perspective.  And he's saying that, from my perspective, we

9    should recognize that for five years you've been law-abiding.

10   And that is a credit to a prosecutor who doesn't see things as

11   black and white, but takes into account the same factors that

12   I'm taking into account.  And so I credit that, especially

13   because I consider the money laundering of cartel funds to be

14   extremely serious.

15        So with all of those factors weighed, I'm going to

16   adopt his recommendation of 65 months.

17        I'm also going to impose a two-year period of

18   supervised release.

19        I'm going to impose a $100 special assessment.

20        I've already entered the preliminary order of

21   forfeiture.

22        And I'm going to impose a $7,500 money judgment that

23   you agreed to within the plea agreement.

24        Now, I need to go through the factors for when you are

25   on supervised release so that you can assimilate back within

1    the community.

2            And those factors, if you'll listen carefully to.

3            You shall not commit another federal, state, or local

4    crime.

5            You shall not unlawfully possess a controlled

6    substance.

7            And you shall cooperate in the collection of a DNA

8    sample if it is required by the law.

9            You shall provide financial support for any dependents

10   if you're able to do so financially.

11           And you shall seek, and work conscientiously at,

12   lawful employment.

13           And if you are not gainfully employed, then you should

14   pursue a course of study or vocational training that will equip

15   you for employment.

16           You shall not knowingly meet or communicate with any

17   person you know to be engaged or planning to be engaged in

18   criminal activity.

19           And you shall refrain from excessive use of alcohol.

20           You shall not possess a firearm, a destructive device,

21   or other dangerous weapon.

22           And you should refrain from any use of a narcotic drug

23   unless it is prescribed to you by a licensed medical

24   practitioner.

25           You shall not knowingly leave from the federal

Case: 22-2349   Document: 16      Filed: 01/04/2023      Pages: 75

1   judicial district from which you're being supervised.

2          So this is the Northern District of Illinois.  It

3   comprises the top 18 counties of the State of Illinois.  If,

4   for some reason, you're not released here, but you're released

5   to a different judicial district, then you need to learn what

6   the judicial district comprises as far as its counties.  For

7   your benefit today, Northern District of Illinois is Cook,

8   DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone,

9   Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson,

10  Whiteside, and Winnebago.  So you have to stay within those

11  areas unless you get permission from the Court or from

12  Probation.

13         You shall report to the probation officer as directed

14  by Probation.

15         And you shall permit the probation officer to visit

16  you at any reasonable time, at home, at a community service

17  location, at another reasonable location specified by the

18  probation officer.

19         And you shall permit confiscation of any contraband

20  that is observed in plain view.

21         You shall notify the probation officer within 72 hours

22  if you become aware of a change in your residence or your job,

23  your workplace, your employer.

24         And unless you have a constitutional or other legal

25  privilege, you shall truthfully answer the questions posed to

1   you by the probation officer.

2          You shall notify the probation officer within 72 hours

3   if you are arrested, charged with a crime, or even questioned

4   by law enforcement.

5          You shall, if you're unemployed after 60 days of

6   supervision, or if you become unemployed for 60 days, perform

7   at least 20 hours of community service per week at the

8   direction of the Probation Office.  And that shall not exceed

9   200 hours in total.

10          You shall not incur new credit charges or open

11   additional lines of credit without the approval of the

12   probation officer unless you are in compliance with the

13   financial obligation imposed by this judgment, that $7,500 and

14   the $100 special assessment.

15          You shall provide the probation officer with access to

16   any requested financial information necessary to monitor your

17   compliance with this condition.

18          And within 72 hours of any significant economic change

19   in your circumstances that might affect your ability to pay the

20   money judgment, then you must notify the probation officer of

21   that change.

22          You shall not enter into any agreement to act as an

23   informer or a special agent of a law enforcement agency without

24   the permission of the Court.

25          Any objections, Mr. Gottreich, to any of those?

1              MR. GOTTREICH:  No, Judge.

2              THE COURT:  Any from you?

3              MR. FRANZBLAU:  No, your Honor.

4              THE COURT:  Okay.  Those will be the conditions of

5     supervised release.

6              Now, remember, you do have a right to appeal my

7     sentence.  And in order to do so, you have to file a notice of

8     appeal within 14 days of the entry of the judgment and

9     commitment order.  And Mr. Gottreich can help you do that, if

10    that's something you want to do.

11             Now, Ms. Kwong, have I missed anything that you think

12    needs to be addressed?

13             PROBATION OFFICER:  No, your Honor.

14             THE COURT:  Okay.  And, Mr. Gottreich, anything I

15    didn't address that you raised that you want me to address

16    before we complete?

17             MR. GOTTREICH:  No, Judge.

18             THE COURT:  And from you, Mr. Franzblau?

19             MR. FRANZBLAU:  No, your Honor.  Thank you.

20             THE COURT:  All right, sir.  Remember that there --

21    you're a young person.  You have a whole family looking forward

22    to you to come back to.  And that is a motivation to continue

23    on the right path when you're done.  Probation will help you

24    when you get out of prison to get you back on that path.  You

25    can close this door behind you and move forward.

1       And recognize that the only reason you're here is

2  because of the impact that one decision over those seven months

3  might have had.  And the next time, when you're thinking of

4  that type of decision that might seem easy on the outside,

5  think of all those people that might be harmed by it.  And I

6  guarantee you, you won't be back.  All right?

7       Thank you.

8       MR. FRANZBLAU:  Thank you, your Honor.

9       THE CLERK:  Your Honor, we need a surrender date.

10      THE COURT:  Oh, right.

11      So, normally, they need approximately 90 days.  So I

12 can move out 90 days from now.  Is that appropriate?

13      MR. GOTTREICH:  Yes, Judge.

14      THE CLERK:  So that could be Friday, October 14th.

15      THE COURT:  That's perfect.

16      THE CLERK:  Your Honor, was there any recommendation?

17      THE COURT:  Do you have a recommendation?

18      MR. GOTTREICH:  Judge, you know, I should have looked

19 into this.  It would be a place in Colorado, if possible.

20      THE COURT:  Yes, right.  So you don't want the big

21 one, the supermax.

22      MR. GOTTREICH:  No.

23      THE COURT:  But we'll put an appropriate facility in

24 Colorado.

25      MR. GOTTREICH:  Thank you, Judge.

1     THE COURT:  I'm not sure which those are, but we'll

2   put it in there.

3     MR. GOTTREICH:  Thank you.  I appreciate it.

4     THE COURT:  Good luck to you.

5     MR. FRANZBLAU:  Your Honor, I'm sorry.

6     Finally, the government moves to dismiss all remaining

7   counts with respect to this defendant.

8     THE COURT:  Okay.  Thank you.  Appreciate it.

9     All right.  Have a good day, everyone.

10     MR. FRANZBLAU:  Thank you, Judge.

11     THE CLERK:  All rise.  Court is adjourned.

12    (Adjourned at 10:26 a.m.)

13               C E R T I F I C A T E

14    I certify that the foregoing is a correct transcript of the

15   record of proceedings in the above-entitled matter.

16

17   */s/ GAYLE A. McGUIGAN*                    *September 7, 2022*
     GAYLE A. McGUIGAN, CSR, RMR, CRR
18   Official Court Reporter

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2023, I electronically filed the foregoing Brief and Appendix of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:     /s/ *Jonathan L. Shih*
JONATHAN L. SHIH
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-5361